IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 1, 2021

IN RE SEBASHTIAN K. ET AL.

Appeal from the Juvenile Court for Hamilton County
No. 293069, 293070, 293071     Robert D. Philyaw, Judge

———————————————

No. E2020-01439-COA-R3-PT

———————————————

A mother and father appeal the termination of their parental rights to three children. The juvenile court concluded that there was clear and convincing evidence of multiple statutory grounds for termination. The court also concluded that there was clear and convincing evidence that termination of the parents' parental rights was in the children's best interest. After a thorough review, we agree and affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which KENNY W. ARMSTRONG and KRISTI M. DAVIS, JJ., joined.

Greta Locklear, Chattanooga, Tennessee, for the appellant, Louana M.

David C. Veazey, Chattanooga, Tennessee, for the appellant, Robert K.

Herbert H. Slatery III, Attorney General and Reporter, and Kristen Kyle-Castelli, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

**I.**

**A.**

On May 22, 2018, sheriff's deputies executed a narcotics search warrant at the home occupied by Louana M. ("Mother"), Robert K. ("Father"), and their three children, Sebashtian, Starla, and Skylar. The search uncovered a stash of ecstasy pills. The poor

condition of the home prompted the sheriff's office to contact the Tennessee Department of Children's Services ("DCS") and Chattanooga Codes and Community Services Division. After inspecting the home, codes officials decided it should be condemned.

Upon arrival, the DCS investigator noted the smell of marijuana and something putrid throughout the home. Piles of trash impeded access to several rooms. There was no food in the refrigerator—only condiments and milk. The kitchen sink was full of dirty dishes. Food was smeared on the kitchen floor. The home was also infested with roaches and gnats. The children were covered in dirt and appeared underweight. Starla and Skylar, four-year-old twin girls, wore only pull-ups. One twin's hair was extremely matted.[1] Neither twin was potty trained. Sebashtian, the five-year-old, had lice. All three children still drank from baby bottles.

The parents consented to urine drug screens. Father tested positive for THC[2] and opiates. Mother's test revealed the presence of amphetamines, methamphetamine, opiates, oxycodone, and marijuana. Both parents admitted to smoking marijuana. Mother also admitted that she had taken an ecstasy pill the previous night.

Mother reported significant untreated mental health issues. She had been diagnosed with bipolar disorder, depression, anxiety, and dual personality disorder. Her mental illness qualified her for monthly disability payments.

DCS took the children to a local hospital for evaluation. The twins were diagnosed with severe failure to thrive. Both girls were in kidney and liver failure. Their blood work evidenced starvation. All three children were found to have severe developmental delays due to chronic neglect.

The next day, the juvenile court granted DCS's petition for temporary legal custody.[3] The children were placed in level two foster homes because of their medical needs. Although the siblings were initially separated, within a few months they were reunited in the same foster home.

According to the children's medical records, they had not received any medical care for almost three years. After catching up on their required vaccinations, all three children began an intensive therapy regimen. The twins had feeding therapy and speech therapy

---

[1] After spending five or six hours trying to untangle the knots in Starla's hair, the foster mother was forced to cut it off.

[2] Tetrahydrocannabinol or THC "is a marijuana metabolite." *Interstate Mech. Contractors, Inc. v. McIntosh*, 229 S.W.3d 674, 677 (Tenn. 2007).

[3] A few months later, DCS filed an amended petition including allegations of severe child abuse as to the twins.

twice a week as well as weekly physical and occupational therapy. Feeding therapy was critical for the twins as they were unable to chew and swallow solids without choking. Sebashtian received some initial feeding therapy. But his most critical needs were speech and occupational therapies.

DCS developed a permanency plan for the family. Among other things, the plan sought to address the barriers to reunification, including income, stable housing, mental health, substance abuse, possible domestic violence, and parenting. Father claimed a substantial income from his car detailing business. Yet the family lacked appropriate housing. Both parents had pending criminal charges based on the drugs found in their home. Father faced aggravated assault charges from a dispute with a customer in 2017. The parents also disclosed that they had previously surrendered their parental rights to three older children in Georgia.

The permanency plan placed a number of responsibilities on the parents. The parents were required to complete mental health and substance abuse assessments as well as parenting and domestic violence classes. They were also required to follow any treatment recommendations from the assessments. DCS also asked the parents to provide proof of income and to maintain residential stability for a minimum of six months. While the children remained in foster care, the parents were also expected to pay child support and to maintain contact with the children through scheduled visits and phone calls.

The court ordered supervised visitation once a month for four hours. DCS provided transportation and contracted with another agency to supervise the visits. The visit supervisor reported that the parents routinely brought snacks that the twins could not eat. They rarely interacted with the children, seemingly content to watch the children play. Father did not respond well to redirection.

DCS connected the parents with an in-home service provider to assist them with completing their plan responsibilities. But the parents failed to appear at multiple appointments. The service provider ultimately terminated services, citing the parents' lack of cooperation. Father did complete a mental health assessment, but he told the assessor that he had no problems and was not interested in treatment. DCS asked Father to obtain another assessment, deeming the first one invalid.

At the adjudicatory hearing on January 25, 2019, the parents stipulated that the children were dependent and neglected. Although they denied any wrongdoing, they also agreed that the twins were the victims of severe child abuse. Based on the parents' stipulation and the record as a whole, the court adjudicated all three children dependent and neglected. The court also found clear and convincing evidence that the twins were victims of severe child abuse at the hands of Mother and Father.

3

About a month later, Mother told the family service worker that she was scared to go home with Father. According to Mother, he had broken her face, ribs, and arms in the past. The service worker drove Mother to a nearby domestic violence shelter. After a short stay, Mother moved to a long-term shelter in another county.

The family service worker arranged for another service provider to work with Mother on her plan responsibilities while she was living in the shelter. Mother completed three weeks of in-patient substance abuse treatment. Upon discharge, she was transferred to another care facility for out-patient treatment. Unhappy with the facility's rules, Mother left without notifying DCS. The family service worker lost contact with Mother for almost a month. She eventually surfaced at another domestic violence shelter. Mother blamed her disappearance on problems with her cell phone.

Mother cycled in and out of domestic violence shelters for the rest of the year. Despite DCS's efforts, Mother invariably resumed her relationship with Father. In July, Mother obtained an ex parte order of protection. But the temporary order was dismissed when Mother failed to appear at the scheduled hearing. Mother's mental health also remained a significant problem. She spent a week in a psychiatric hospital. And she continued to test positive for THC.

Father still lacked stable housing and proof of his claimed income. More than once, he indicated that he was close to obtaining housing. But he never followed through. Nor did he obtain a new mental health assessment, as requested. A previous mental health assessment in 2012 indicated that Father had severe anger issues. And he became increasingly hostile with the staff at his supervised visits. After a particularly heated exchange, the supervising agency terminated services. Visits were moved to the local DCS office.

DCS referred Father to a new service provider who helped him complete anger management and domestic violence classes. But his behavior did not improve. The court suspended his visitation in August 2019. Blaming DCS, Father threatened the family service worker with bodily harm. And he bombarded her with hundreds of rude text messages at all hours. So DCS asked him to complete another round of anger management classes.

Mother and Father resolved their pending criminal charges in early 2020. Mother pled guilty to three counts of drug possession stemming from her 2018 drug arrest. Father pled guilty to simple assault. Both parents received probation. Father was also ordered to pay $5400 in restitution to the assault victim.

With the parents showing so few signs of improvement, DCS petitioned to terminate their parental rights.[4]  The petition, filed May 1, 2020, sought to terminate the parental rights of both parents based on persistence of conditions and severe child abuse.  DCS also alleged that Father's parental rights should be terminated for failure to manifest an ability and willingness to assume custody or financial responsibility for the children.

B.

The court heard evidence on the termination petition four months later.  At the outset, the court denied both parents' requests for a continuance.

After the termination petition was filed, Mother completed the outpatient component of her substance abuse treatment.  She also sought treatment for her mental illness.  But, as the family service worker related, significant issues remained unresolved.  Mother's most recent drug screen was positive for THC.  She lacked stable housing.  And she refused to end her relationship with Father.

Father had yet to address his anger issues either by completing another round of anger management classes or seeking a new mental health assessment.  Despite his claimed income, Father had never paid any child support.  Nor had he taken steps to reinstate his visitation rights.

Mother defended her decision to stay with Father.  She claimed he had not hit her since February 2019.  Admittedly, she had frequented domestic violence shelters after that date, but it was only to appease DCS.

She acknowledged that the hotel room she shared with Father was not appropriate for the children.  But she was actively seeking better housing.  According to Mother, the pandemic limited the available housing options.

Mother conceded that she had failed her children.  Her relationship with the children was "not what [she] want[ed] it to be."  But she was "a totally different person" now.  Shortly before trial, she finished her substance abuse treatment.  She last smoked marijuana in August 2019.  She blamed her recent positive drug screen on the CBD oil she used as a substitute.  And her mental illness was under control with medication management and

---

[4] DCS discovered that Mother had never obtained a divorce from her husband, Charles P.  When DCS contacted Charles P., the children's legal father, he was completely unaware of their existence.  *See* Tenn. Code Ann. § 36-1-102(29)(A)(ii) (Supp. 2020) (defining legal parent as "[a] man who is or has been married to the biological mother of the child if the child was born during the marriage").  And he had no interest in asserting his parental rights.  So, in its petition to terminate, DCS also sought to terminate the legal father's parental rights to the children.  Charles P. did not appeal the court's judgment terminating his parental rights.

5

therapy. Still, she planned to stop medication management, believing she could achieve the same result with CBD oil.

Father maintained that he had completed most of his plan responsibilities with little or no help from DCS. He never paid any child support "because [his] kids should not be in DCS custody." He blamed any problems with his mental health assessment on the test, not his answers. While he may have been in a few "domestic fights," the last one was in 2018. Mother was delusional when she said otherwise. And he finished his required classes. He categorically denied having an anger management problem. He claimed that he was just loud.

He acknowledged that he no longer had a relationship with the children. He had not seen them in over a year. And he conceded that he was not ready to take custody. He needed another "month, month and a half" to find better housing. He was willing to retake his assessments and classes, if necessary. He just wanted a fresh start with a new family service worker because the last three had been biased against him.

Neither parent seemed to appreciate the seriousness of the children's condition when removed from their home. Father thought that the children were in "fair condition" when they were removed because they had food and shelter. And both parents blamed the medical needs and developmental delay of the twins on their premature birth.

The trial court terminated the parental rights of both parents. The court found clear and convincing evidence supported the three alleged grounds for termination. The court also determined, by the same measure of proof, that termination of parental rights was in each child's best interest.

## II.

Mother argues that the trial court erred in denying her request for a continuance on the first day of trial. A trial court's decision to grant or deny a motion for continuance is discretionary. *Nagarajan v. Terry*, 151 S.W.3d 166, 172 (Tenn. Ct. App. 2003). We will not disturb the court's decision absent a clear showing of an abuse of discretion and unfair prejudice. *Blake v. Plus Mark, Inc.*, 952 S.W.2d 413, 415 (Tenn. 1997); *see also Comm'r of Dep't of Transp. v. Hall*, 635 S.W.2d 110, 111 (Tenn. 1982) ("[I]n order to show an abuse of discretion, the plaintiff must show some prejudice or surprise which arises from the trial court's failure to grant the continuance.").

A trial court may grant a continuance at any time upon a showing of good cause. Tenn. Code Ann. § 20-7-101 (2009). "[T]he moving party must supply some 'strong excuse' for postponing the trial date." *Howell v. Ryerkerk*, 372 S.W.3d 576, 580 (Tenn. Ct. App. 2012) (citation omitted). In making its decision, the court should consider "(1) the length of time the proceeding has been pending, (2) the reason for the continuance, (3)

the diligence of the party seeking the continuance, and (4) the prejudice to the requesting party if the continuance is not granted." *Id.* at 580-81 (quoting *Nagarajan*, 151 S.W.3d at 172).

We find no abuse of discretion here. Mother sought to postpone the trial so that she could complete her plan responsibilities. DCS did not allege that her parental rights should be terminated for substantial noncompliance with her responsibilities in the plan. And she had ample opportunity to complete her responsibilities prior to the filing of the petition to terminate. Mother did not make the necessary showing of good cause. Nor has she shown unfair prejudice.

## III.

Tennessee Code Annotated § 36-1-113 sets forth both the grounds and procedures for terminating parental rights. *In re Kaliyah S.*, 455 S.W.3d 533, 546 (Tenn. 2015). Parties seeking termination of parental rights must first prove the existence of at least one of the statutory grounds for termination listed in Tennessee Code Annotated § 36-1-113(g). Tenn. Code Ann. § 36-1-113(c)(1) (Supp. 2020). If one or more statutory grounds for termination are shown, they then must prove that terminating parental rights is in the child's best interest. *Id.* § 36-1-113(c)(2).

Because of the constitutional dimension of the rights at stake in a termination proceeding, parties seeking to terminate parental rights must prove both the grounds and the child's best interest by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citing Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 808-09 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)). This heightened burden of proof serves "to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights." *Id.* "Clear and convincing evidence" leaves "no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992). It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established. *In re Bernard T.*, 319 S.W.3d at 596.

We review the trial court's findings of fact "de novo on the record, with a presumption of the correctness of the findings, unless the preponderance of the evidence is otherwise." *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); Tenn. R. App. P. 13(d). We then "make [our] own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim." *In re Bernard T.*, 319 S.W.3d at 596-97. We review the trial court's conclusions of law de novo with no presumption of correctness. *In re J.C.D.*, 254 S.W.3d 432, 439 (Tenn. Ct. App. 2007).

7

A.

## 1. Severe Child Abuse

Neither parent challenges the ground of severe child abuse. Still, we "must review the trial court's findings as to each ground for termination . . . regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d 507, 525-26 (Tenn. 2016).

Under Tennessee Code Annotated § 36-1-113(g)(4), a parent's rights may be terminated if "[t]he parent . . . has been found to have committed severe child abuse as defined in § 37-1-102, under any prior order of a court or is found by the court . . . to have committed severe child abuse against any child." Tenn. Code Ann. § 36-1-113(g)(4). To prove this ground, DCS entered the juvenile court's adjudicatory hearing order into evidence. In that order, the juvenile court found clear and convincing evidence that Mother and Father committed severe child abuse against the twins "because they were diagnosed with severe failure to thrive, including kidney and liver failure, at the time of their removal from the parents' home." *See* Tenn. Code Ann. § 37-1-102(27)(B) (2014) (defining "severe child abuse" as "[s]pecific brutality, abuse or neglect towards a child that in the opinion of qualified experts has caused . . . severe developmental delay . . . or severe impairment of the child's ability to function adequately in the child's environment, and the knowing failure to protect a child from such conduct"). Neither parent appealed the court's order. So it became a final judgment.

DCS met its burden of proving this ground for termination. The court's previous severe abuse finding serves as conclusive proof that Mother and Father committed severe child abuse against the twins. *See In re Heaven L.F.*, 311 S.W.3d 435, 439-40 (Tenn. Ct. App. 2010) (holding the issue of whether a mother committed severe child abuse was res judicata where the issue was fully litigated in a previous dependency and neglect action). The severe abuse finding also satisfies this ground for termination of both parents' parental rights to Sebashtian. As the statute makes clear, a parent's rights may be terminated when the parent "ha[s] committed severe child abuse against any child." Tenn. Code Ann. § 36-1-113(g)(4); *see also In re Trinity S.*, No. E2021-00098-COA-R3-PT, 2021 WL 3486188, at *6 (Tenn. Ct. App. Aug. 9, 2021); *In re Kayden A.*, No. W2020-00650-COA-R3-PT, 2021 WL 408860, at *10 (Tenn. Ct. App. Feb. 5, 2021).

## 2. Persistence of Conditions

The juvenile court also found termination of parental rights appropriate under Tennessee Code Annotated § 36-1-113(g)(3), a ground commonly referred to as "persistence of conditions." *See In re Audrey S.*, 182 S.W.3d 838, 871 (Tenn. Ct. App. 2005). The ground of persistence of conditions focuses "on the results of the parent's efforts at improvement rather than the mere fact that he or she had made them." *Id.* at 874.

8

So the question before the court is "the likelihood that the child can be safely returned to the custody of the [parent], not whether the child can safely remain in foster care." *In re K.A.H.*, No. M1999-02079-COA-R3-CV, 2000 WL 1006959, at *5 (Tenn. Ct. App. July 21, 2000).

Only Mother appealed this ground for termination. Still, we will review the record to determine whether the evidence supports this statutory ground as to both parents. *In re Carrington H.*, 483 S.W.3d at 525-26.

There are several elements to the ground of persistence of conditions. Persistence of conditions may be a basis to terminate parental rights when:

> The child has been removed from the home or the physical or legal custody of a parent . . . for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:
>
> (i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent . . . , or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent . . . ;
>
> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent . . . in the near future; and
>
> (iii) The continuation of the parent . . . and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3)(A). Each of the statutory elements must be established by clear and convincing evidence. *In re Valentine*, 79 S.W.3d at 550.

At the time of trial, the children had been removed from the parents' custody for well more than six months. *See* Tenn. Code Ann. § 36-1-113(g)(3)(B) ("The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard."). And this record contains clear and convincing evidence that conditions preventing reunification of this family remain. Mother and Father lack stable housing. Father has yet to acknowledge, much less properly address, his anger issues. Despite the court's warnings, Father repeatedly interrupted the trial with his angry commentary. Mother continues to associate with a man she has accused of domestic abuse. And she still tests positive for THC. While her mental health status is greatly improved with medication

9

and therapy, she plans to stop participating in medication management in favor of "vaping with CBD oil."

Clear and convincing evidence also shows that there is little likelihood that these conditions will be remedied in the near future. Mother and Father maintained at trial that they would be able to care for the children in a month or two. But DCS had been working with this family for over two years. And significant barriers to reunification remain. "Where . . . efforts to provide help to improve the parenting abilities, offered over a long period of time, have proved ineffective, the conclusion that there is little likelihood of such improvement as would allow the safe return of the child to the parent in the near future is justified." *In re Dakota C.R.*, 404 S.W.3d 484, 499 (Tenn. Ct. App. 2012) (citation omitted).

Continuation of the parent-child relationship would also diminish the children's opportunity for an early integration into a safe, stable, and permanent home. The children have been in the same foster home for over two years. They have developed a strong bond with their foster family. The foster family wants to adopt them.

3. Failure to Manifest an Ability and Willingness to Assume Custody or Financial Responsibility of the Children

Finally, the court found termination of Father's parental rights appropriate under Tennessee Code Annotated § 36-1-113(g)(14). Under this ground, a parent's rights may be terminated if he or she

> [1] has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and [2] placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

Tenn. Code Ann. § 36-1-113(g)(14). Both prongs must be established by clear and convincing evidence. *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020). As to the first prong, the petitioner may prove that a parent is either unable or unwilling to "assume legal and physical custody or financial responsibility of the child." *Id.* at 677.

Clear and convincing evidence shows Father's lack of ability and willingness to assume custody and financial responsibility of the children. Father conceded his inability to provide appropriate housing. And he has never sufficiently addressed his severe anger issues. His failure to pay any child support for over two years, despite his purported income, evidences an unwillingness to assume financial responsibility for these children.

10

The evidence is equally clear and convincing that placing the children in Father's custody would pose a risk of substantial harm to their psychological welfare. Father's volatility alone poses a risk of substantial harm to these children. And the children have not seen him in over a year. They have bonded with the foster family. Returning the children to the custody of a virtual stranger also carries a risk of substantial harm. *See In re Braelyn S.*, No. E2020-00043-COA-R3-PT, 2020 WL 4200088, at *17 (Tenn. Ct. App. July 22, 2020), *perm. app. denied*, (Tenn. 2020) (reasoning that returning the child to a "virtual stranger" in light of her strong bond with her current caregivers would constitute substantial harm).

B.

Lastly, Mother and Father argue that it was not in the children's best interests to terminate their parental rights. Because "[n]ot all parental misconduct is irredeemable," our parental termination "statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interests." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005). So even if a statutory ground for termination is established by clear and convincing evidence, we must also determine whether termination of parental rights is in the child's best interests. Tennessee Code Annotated § 36-1-113(i) lists nine factors that courts must consider in making a best interest analysis. The "factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis." *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017). In reaching a decision, "the court must consider all of the statutory factors, as well as any other relevant proof any party offers." *Id.* at 682. The best interest analysis is a fact-intensive inquiry, and each case is unique. *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004).

The juvenile court found all factors favored termination. Mother contends that the evidence does not support the trial court's findings on factors two, seven, and eight. And both parents complain that DCS's efforts to reunify this family were inadequate.

The first statutory factor focuses on whether the parent "has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent." Tenn. Code Ann. § 36-1-113(i)(1). The second factor considers the parent's potential for lasting change "after reasonable efforts by available social services agencies." *Id.* § 36-1-113(i)(2). The court found no such adjustment by either parent. The evidence is overwhelming that neither parent had made such an adjustment that the children could be safely returned to their care.

Mother and Father blame DCS for their lack of improvement. But the evidence does not preponderate against the court's finding that DCS's efforts were reasonable. While Mother and Father claimed that DCS offered them no assistance, the family service workers testified differently. The court credited the testimony from DCS's witnesses. We

11

will not disturb the court's credibility finding on this record. *See Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999).

The third factor looks at whether the parent has maintained regular contact with the children. Tenn. Code Ann. § 36-1-113(i)(3). The court found that this factor favored termination. With respect to Father, we agree. His visits were suspended in August 2019 after repeated inappropriate behavior. And he never asked the court to restore his visitation rights. But for the most part, Mother's visitation has been consistent. Factor three favors Mother.

The fourth factor asks whether the parent has maintained a meaningful relationship with the children. *See id.* § 36-1-113(i)(4). The evidence does not preponderate against the trial court's finding that Mother and Father lack a meaningful relationship with any of the children. Father admitted as much at trial. Mother agreed that her relationship was not what she wanted it to be.

The fifth factor considers the effect a change in caregivers would have on the child's emotional, psychological, and medical condition. *Id.* § 36-1-113(i)(5). The evidence does not preponderate against the trial court's finding that a change in caregivers would be "catastrophic" for these children. As the court noted the foster family "made near herculean efforts to catch these children up developmentally and medically." The children are thriving in their current environment. Neither parent is familiar with the children's current medical and developmental needs. This factor favors termination.

The sixth factor asks whether the parent "has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child." Tenn. Code Ann. § 36-1-113(i)(6). This factor favors termination. Mother and Father committed severe child abuse against the twins. And Sebashtian was found to have severe developmental delay caused by chronic neglect.

The seventh factor looks at the parent's home environment and whether the use of alcohol or other controlled substances would prevent the parent from properly caring for the child. *Id.* § 36-1-113(i)(7). Mother contends that there is no proof in this record that the parent's current home at a local hotel is unsafe. But Mother and Father admitted that their current home environment would be inappropriate for the children. And Mother's most recent drug screen was positive for THC.

The eighth factor evaluates whether the parent's mental or emotional status prevents proper parenting. *Id.* § 36-1-113(i)(8). The court found that Mother and Father still struggle with mental health and instability. The court noted the parents' "volatile performances during trial" as further proof that they were unable to properly care for these children. Mother complains that the trial court ignored her recent success in managing her

12

mental health. We commend Mother on her progress. But we cannot ignore her ill-advised plan to trade medication management for CBD oil.

Lastly, the ninth factor examines the parent's child support history. *Id.* § 36-1-113(i)(9). Neither parent paid any child support. We are not persuaded by Father's unique argument that this factor is inapplicable when children are in foster care. He cites no legal authority for his position. And we know of none.

Although the evidence weighs against one of the court's factual findings as to Mother, the evidence supports the court's other findings. We conclude that the proven facts amounted to clear and convincing evidence that termination of both parents' parental rights was in the children's best interests.

## IV.

We affirm the termination of both parents' parental rights. The record contains clear and convincing evidence to support two statutory grounds for termination of Mother's parental rights and three statutory grounds for termination of Father's parental rights. We also conclude that terminating parental rights was in each child's best interest.

        s/ W. Neal McBrayer
        W. NEAL MCBRAYER, JUDGE